IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

PARIS TAYLOR,

    Plaintiff,

v.

RYAN SUTTERER, MOHAMMED
SIDDIQUI, WEXFORD HEALTH
SOURCES, INC., and FRANK
LAWRENCE,

    Defendants.

Case No. 19-CV-00044-SPM

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

This matter comes before the Court for consideration of a Motion for Summary Judgment and memorandum in support filed by Defendants Ryan Sutterer, Mohammed Siddiqui, and Wexford Health Sources, Inc. (hereinafter "Defendants"). (Docs. 109, 110).[1] For the reasons set forth below, the Court grants the motion for summary judgment.

## BACKGROUND

Plaintiff Paris Taylor, an inmate in the Illinois Department of Corrections ("IDOC"), filed this action under 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred at Menard Correctional Center ("Menard"). (Doc. 49).[2] According to the Amended Complaint, Taylor suffers from chronic vision

---

[1] Defendant Frank Lawrence, the acting warden at Menard Correctional Center and the only Illinois Department of Corrections (*i.e.,* non-Wexford) Defendant in this matter, was added to the docket in his official capacity only for addressing any injunctive relief that might be ordered.

[2] Although the action was filed *pro se* by Taylor, the Court recruited counsel to represent him in April

problems and received surgery for a retinal detachment in his left eye in March 2014. He was supposed to have a second follow-up surgery to insert a permanent contact lens in his left eye, but before the surgery was performed, he was transferred to Menard Correctional Center. Taylor further claims that in May 2018 he was sent to an ophthalmologist, who determined that he had pressure in his right eye and recommended surgery. He ultimately did have surgery, but because of the delay, Taylor suffered severe headaches, blurry vision, and his daily activities were affected. Taylor is proceeding on the following claim:

**Count 1:** Eighth Amendment violation against Defendants for exhibiting deliberate indifference to Taylor's chronic eye problems that resulted in pain and reduced vision.

### RELEVANT FACTS AND ALLEGATIONS

The following facts do not appear to be in dispute amongst the parties.

Dr. Ryan Sutterer was contracted with or employed by Wexford Health Sources, Inc. as the on-site optometrist at Menard. (Doc. 110-1). Dr. Mohammed Siddiqui was the Medical Director of Menard. (Doc. 110-2). Wexford Health Sources, Inc. was the State of Illinois' contracted medical provider for Menard. (Doc. 23).

Taylor believes he was diagnosed with glaucoma, a progressive eye disease, in Danville Correctional Center, where he was incarcerated from 1998 to 2005. (Docs. 110-3, 110-6). During that time, Ophthalmologist Dr. Dimitra Skondra told Taylor she removed his left eye lens during the retinal detachment repair surgery due to damage to his lens from a previous laser surgery, making him aphakic in his left eye.

---

2021, and he has been represented during discovery and dispositive motions. (*See* Docs. 66, 77, 105).

(*Id.*). This condition affects the person's ability to focus properly. (Doc. 110-6). Correction can be accomplished with glasses or contacts. (*Id.*).

Taylor arrived at Menard Correctional Center in January 2016. (Doc. 110-5). On arrival, he was prescribed eye drops including Latanoprost, Brimonidine, Timolol, and Dorzolamide to manage his glaucoma. (*Id.*). Later that January, Dr. Siddiqui requested an urgent ophthalmology consult for Taylor's history of retinal detachment and advanced glaucoma. (*Id.*). In early February 2016, Dr. Eyrich examined Taylor and noted he had a 15-year history of glaucoma, he had not had his drops for two weeks, and he had a history of retinal detachment. Dr. Eyrich diagnosed Taylor with severe primary open angle glaucoma, anisometropia, and aphakia. (*Id.*). Taylor's intra-ocular pressure (hereinafter "IOP") was 20 in the right eye and 14 in the left eye. (*Id.*). An average person's IOP is between 8 and 20, although that can vary and some may tolerate a higher pressure. (Doc. 110-6). If the pressure in the eye is high, it causes damage to the optic nerve, and the higher the pressure, the quicker that damage can happen. (*Id.*). Dr. Eyrich recommended Taylor restart his Latanoprost, Brimonidine, Timolol, and Dorzolamide eye drops, and he submitted a Medical Special Services Referral and Report to send Taylor to a "Quantum Cataract Surgeon" for an evaluation for a posterior chamber intra-ocular lens because he had a "history of retinal detachment surgery OS [left eye] but was left aphakic." (Doc. 110-5).

Later in February 2016, a request to send Taylor to a Quantum Cataract Surgeon was approved, and his appointment was scheduled for late March 2016. (Doc. 110-5). Taylor saw Dr. Eric Wigton at Quantum Vision Centers during that time for a glaucoma evaluation. (Doc. 110-8). Wigton does not perform surgeries, but he does

Page 3 of 17

provide recommendations for surgery. (*Id.*). Wigton described Taylor's glaucoma as moderate. (*Id.*). Wigton wrote that Taylor had a retinal detachment on the left side secondary to a gunshot wound and had primary open angle glaucoma in both eyes with IOPs of 23 on the right and 17 on the left. (*Id.*). Taylor was using two separate pairs of eyeglasses and he was compliant with his eye drops. (*Id.*). Wigton noted Taylor should return to the clinic in four months. (*Id.*).

In March 2016, Taylor saw Dr. Peter Kehoe at Menard Correctional Center for a medical furlough follow-up. (Doc. 110-5). His IOPs were 28 on the right and 18 on the left. Kehoe noted that Taylor needed his eye drops and also wrote a permit for Taylor to use two pairs of glasses. (*Id.*).

In May 2016, Dr. Ryan Sutterer saw Taylor for an IOP check – his pressures were 25 on the right and 20 on the left. Sutterer recommended he return to the clinic in one month for another IOP check. (Doc. 110-5). Later that month, Taylor signed that he received new pairs of eyeglasses. (*Id.*).

In July 2016, Sutterer saw Taylor for an IOP check, and his IOPs were 15 on the right and 20 on the left. (Doc. 110-5). Sutterer recommended a follow-up after medical furlough. (*Id.*).

In February 2017, Sutterer saw Taylor for an eye examination. His IOPs were 21 on the right and 14 on the left. (Doc. 110-5). Sutterer completed a referral for Taylor to see Wigton. (*Id.*). Later that month, Taylor filed a grievance detailing his chronic vision issues, including headaches from straining to see without a proper lens, and explaining that he needed to be referred back to Wigton based on Wigton's earlier recommendation to return after four months. (Doc. 111-1). The counselor's response

stated that Sutterer had submitted a referral for offsite care to Wexford's collegial review process for approval. (*Id*.). Taylor filed another grievance in March 2017 regarding refills of his eye drops where he complained of headaches. (*Id*.). He did not present to sick call for headaches during this time.

In April 2017, Taylor returned to Wigton for a glaucoma check. (Doc. 110-8). Taylor reported good compliance with his eye drops and no vision changes that he was aware of. He also stated that his eyes felt fine, but he had headaches often for two months. (*Id*.). Wigton noted Taylor's IOPs were 26 on the right and 20 on the left, his aphakia was stable, and he continued Taylor's drops. (*Id*.).

In June 2017, Sutterer saw Taylor for an IOP check and his IOPs were 23 on the right and 14 on the left. (Doc. 110-5). Later that month, Sutterer referred Taylor to Wigton for an appointment in 4-5 months. (*Id*.). The referral was later approved. (*Id*.).

In August 2017, Sutterer noted Taylor returned his glasses for an incorrect prescription and stated he would follow-up after Taylor's appointment with Wigton. (Doc. 110-5).

In September 2017, Taylor returned to Wigton for a glaucoma follow-up. (Doc. 110-8). Taylor said he used his eyedrops every day, but still had trouble with his glasses due to his aphakia. (*Id*.). He also noted that he was supposed to have a permanent contact lens for his left eye put in the year before to no avail. (*Id*.). Wigton noted Taylor's IOPs were 18 on the right and 13 on the left and that he would benefit from a contact lens. (*Id*.). He also recommended that Taylor continue using his eye drops. (*Id*.).

In late October 2017, Sutterer reviewed and discussed Taylor's previous visit with Wigton. (Doc. 110-5). He completed referrals for Taylor to receive a follow-up appointment with Wigton and to receive a contact lens to collegial, which were later approved. (*Id.*). Sutterer then examined Taylor for the contact lens and referred to collegial for approval of Taylor's contact lens prescription, which was approved in January 2018. (*Id.*). Later that month, Sutterer examined Taylor due to worsening headaches and ordered him Ibuprofen. (*Id.*).

In February 2018, Taylor saw optometrist Dr. Mark Yates at Quantum Vision. (Doc. 110-5). Taylor reported using his eye drops and Yates noted Taylor's IOPs were 19 on the right and 11 on the left. (*Id.*). Yates provided Taylor with a prescription for glasses. (*Id.*). Later that month, Sutterer dispensed Taylor's contact lenses. (*Id.*).

In April 2018, Sutterer saw Taylor in the optometry clinic and ordered Taylor rubber-framed glasses. (Doc. 110-5).

On May 11, 2018, Sutterer saw Taylor in response to Taylor's complaint of pain and reduced vision in his right eye. (Doc. 110-5). Taylor described the high pressure in his right eye as feeling like someone was "squeezing his eyeball," and "very painful." (Doc. 110-3). Sutterer noted his IOPs were 48 on the right and 42 on the left and completed an urgent referral to send Taylor to Quantum Vision. (Doc. 110-5). Wexford approved the urgent referral and Wigton examined him the same day. (*Id.*). Wigton found that his IOPs were 41 on the right and 37 on the left. (Doc. 110-8). Wigton ordered increased eye drop dosages and recommended Menard schedule an Ahmed shunt procedure for Taylor's right eye. (*Id.*). The note listed a tentative date of July 16, 2018 for the surgery. (*Id.*). In his deposition, Wigton acknowledged that

Page 6 of 17

Taylor had permanent damage from the high IOPs when he saw him. (Doc. 110-6). He also stated that assuming Taylor's IOP stayed high, damage would continue. (*Id.*). By May 18, 2018, Dr. Sutterer observed that Taylor's IOPs were 21 on the right and 20 on the left. (Doc. 110-5).

On June 11, 2018, Dr. Sutterer entered a referral for approval of Taylor's Ahmed shunt procedure and it was subsequently approved. (Doc. 110-5). On July 16, 2018, Taylor's Ahmed shunt surgery was performed without complications. (Doc. 110-8).

In a July 2018 surgery follow up, Wigton found that his IOPs were 8 on the right and 15 on the left. (Doc. 110-8).

In an August 2018 surgery follow up, Wigton found that his IOPs were 8 on the right and 15 on the left. (Doc. 110-8). Taylor reported that he was out of certain prescription eye drops. (*Id.*). Wigton recommended changing dosages on certain drops. (*Id.*). Taylor returned from his appointment with Wigton with new orders for his eye drops. (Doc. 110-5). These new orders were approved by Siddiqui, and he received the eye drops a few days later. (*Id.*).

In September 2018, Sutterer performed an eye exam on Taylor and dispensed contact lenses. (Doc. 110-5). Later that month, at an appointment with Wigton, Wigton found that his IOPs were 19 on the right and 19 on the left. (Doc. 110-8). Wigton recommended changing dosages on certain drops. (*Id.*).

In December 2018, Taylor complained of pain in his right eye and an appointment was scheduled with Sutterer. (Doc. 110-5). Sutterer noted that Taylor's

IOPs were 17 on the right and 17 on the left. (*Id.*). Sutterer charted to continue his drops and dispensed contact lenses. (*Id.*).

In March 2019, Sutterer noted that Taylor's IOPs were 16 on the right and 17 on the left. (Doc. 110-5).

On April 29, 2019, Taylor complained of soreness in his left eye and Sutterer saw him in on May 3, 2019. (Doc. 110-5). Sutterer dispensed a contact lens and adjusted Taylor's eyedrops. (*Id.*).

In June 2019, Sutterer noted that Taylor's IOPs were 18 on the right and 18 on the left. (Doc. 110-5).

In August 2019, Taylor did not attend an appointment to address an irritated contact. (Doc. 110-5).

In September 2019, Sutterer saw Taylor in clinic and continued his eye drops. (Doc. 110-5).

In December 2019, Sutterer noted that Taylor's IOPs were 15 on the right and 15 on the left. (Doc. 110-5).

In April 2020, Sutterer requested another order for contacts for Taylor and the order was approved by collegial. (Doc. 110-5).

In November 2020, Sutterer noted that Taylor's IOPs were 20 on the right and 20 on the left. (Doc. 110-5).

In February 2021, Taylor complained of right eye pain and an appointment was scheduled with Sutterer. (Doc. 110-5). Sutterer saw Taylor a few days later and recommended Taylor return to Wigton. (Doc. 110-8). Wigton examined Taylor in

March 2021 and found that his IOPs were 16 on the right and 16 on the left. He continued Taylor's eye drops. (*Id.*).

In his deposition, Wigton stated that from July or early August 2018 to March 2021, where his notes ended, Taylor's glaucoma appeared to be well-managed. (Doc. 110-6). Wigton also said that to a reasonable degree of medical certainty, Taylor's glaucoma is being well-managed. (*Id.*). Wigton agreed that from March 2016 to March 2021, overall, Taylor had a minimal amount of thinning of the optic nerve and tissue, which he also agreed was not a significant amount of progression. (*Id.*).

Reviewing physician Dr. Jack Cohen noted an absence of evidence in the medical records that Taylor's glaucoma was significantly worse or significantly progressed during this period. (Doc. 110-7). No physician has ever told Taylor that his eyes are worse for not having his eye drops. Dr. Cohen further saw no evidence of damage to Taylor's eyes or vision from having to re-use his contact lenses in the medical records. (Doc. 110-7).

In his deposition, Siddiqui did not recall that he provided any eye care to Taylor, did not make determinations about Taylor's eyecare, and his involvement with Taylor was limited to the collegial review process. (Doc. 110-2). Siddiqui's role was to act as the "middle" to pass on collegial reviews to Dr. Stephen Ritz. (*Id.*). Collegial review is a clinical function; therefore, it does not involve the budget. (Doc. 110-9).

## LEGAL STANDARD

Summary judgment is the moment in a lawsuit where a party lays its proverbial cards on the table, showing what evidence it possesses to convince a trier

of fact to agree with its version of events. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)). Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). That "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere conclusory allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Celotex*, 477 U.S. at 232-24.

In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Spath v. Hayes Wheels Intern.-Indiana, Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). While the Court must view the evidence and draw all reasonable inferences in favor of the opposing party, "[i]nferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors[.]" *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323. Furthermore, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Henning v. O'Leary,* 477 F.3d 492, 496 (7th Cir. 2007).

### DISCUSSION

This case involves a single Eighth Amendment claim for deliberate indifference to a serious medical need against Defendants. The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner [which] constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Claims for deliberate indifference have an objective and a subjective component. *Estelle v. Gamble*, 429 U.S. 97 (1976). Taylor must establish that he suffered from an objectively, sufficiently serious medical condition. *Cesal v. Moats,* 851 F.3d 714, 721 (7th Cir. 2017). Defendants admitted that aphakia and progressive glaucoma can be serious medical conditions. (Doc. 110, p. 18). They later backpedaled on Taylor's aphakia. (Doc. 113).

Taylor must also show that Defendants actually knew of, but disregarded, a substantial risk to the inmate's health. *Cesal,* 851 F.3d at 721. It is well-settled that

mere negligence is not enough to establish a Defendant's deliberate indifference. *See, e.g., Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). In fact, even gross negligence is insufficient. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Instead, deliberate indifference is comparable to criminal recklessness. *Thomas v. Blackard,* 2 F.4th 716 (7th Cir. 2021) (citing *King*, 680 F.3d at 1018). "'Reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood,* 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical decision [ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441.

## I. *Deliberate Indifference Claim against Dr. Ryan Sutterer and Dr. Mohammed Siddiqui*

Sutterer argues that he provided appropriate treatment and that Taylor cannot demonstrate that he acted with deliberate indifference. (Doc. 123, p. 12). Taylor argues not only that Sutterer delayed medical treatment, but that Sutterer was deliberately indifferent to his extreme pain and reduced vision. Based on the record developed during discovery, Taylor's allegations that Sutterer delayed treatment and did not address his pain and vision issues did not create a genuine issue of material fact on whether Sutterer acted with deliberate indifference. Glaucoma is a progressive disease and there is no evidence in the record that proves that a delay in treatment for glaucoma exacerbated injury to Taylor's eye, much less that he was deliberately indifferent to Taylor's extreme pain and reduced vision. The record suggested that Sutterer followed the recommendations of Wigton regarding Taylor's care.

Specifically, during May 2018 when Taylor's IOPs increased dramatically, Sutterer saw Taylor quickly, urgently referred him to Quantum Vision, and Taylor saw Wigton that same day. Wigton, independent of Sutterer, increased Taylor's eye drop dosages and, according to his note, tentatively scheduled him for surgery on July 16, 2018. Importantly, the surgery went on as planned on that date. These facts run counter to Taylor's assertion that Wigton made no recommendation for surgery timing. Additionally, the new eye drop dosages appeared to have reduced Taylor's IOPs greatly in the interim. While Wigton acknowledged that Taylor had permanent damage from the high IOPs when he saw him, this damage was not attributable

Sutterer. The record shows that IOPs can fluctuate, sometimes greatly. As Cohen opined in his review of the medical records, there was also no evidence that Taylor's glaucoma was significantly worse or significantly progressed during this period.

Taylor stated that he had eye pain and blurry vision from the time that he saw Sutterer in May until his surgery, but nothing in the record indicates that he communicated this to Sutterer or any other medical professional. On the whole, the record reveals that Sutterer saw Taylor when Taylor complained of pain or reduced vision through sick calls and he regularly received eye exams. While Taylor's IOPs were considered on the high end of normal throughout the time in question, Sutterer saw Taylor frequently and referred him to specialist appointments with Wigton frequently to conservatively manage his glaucoma. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (a prisoner is "not entitled to the best care possible.").

Regarding Taylor's aphakia, Wigton admitted that it was not necessarily serious. What is more, Taylor's argument that Sutterer persisted in a course of treatment known to be ineffective fell flat. When Taylor transferred to Menard, Siddiqui requested an urgent ophthalmology consult for Taylor and Eyrich submitted a Medical Special Services Referral and Report to send Taylor to a "Quantum Cataract Surgeon." He later saw Wigton at Quantum, ostensibly for his glaucoma, and, even though he noted Taylor's aphakia, Wigton did not mention a need for surgery. Taylor was prescribed new eyeglasses after he was transferred to Menard. When he voiced that he still had trouble with his glasses due to his aphakia, Wigton recommended a contact lens in September 2017. Sutterer entered the referral in October 2017 and the referral was approved November 2017. Sutterer then examined

Taylor's eyes for contacts in December 2017 and he ordered the contacts in January 2018. The contacts were dispensed in February 2018.

Taylor also cannot demonstrate that Siddiqui acted with deliberate indifference. Taylor agreed that Siddiqui did not provide any eye care to Taylor, did not make determinations about Taylor's care, and his involvement with Taylor was limited to the collegial review process. Taylor acknowledged that Siddiqui's role was to act as a middleman to pass on collegial reviews to another doctor. Taylor did not dispute that Siddiqui submitted all of Taylor's eye care requests and that those requests were approved.

Nothing in the record related to Sutterer or Siddiqui indicates conduct so dangerous that the deliberate nature of their actions can be inferred, even the things with which Taylor points to as issues of fact. While that is difficult bar to meet, that is the standard and it is not met here. *"Argument* is insufficient to avoid summary judgment; the nonmoving party needs to come forward with *evidence."* *Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012) (citing *Outlaw v. Newkirk,* 259 F.3d 833, 839 n. 2 (7th Cir. 2001); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 361 (7th Cir.1992)).

Additionally, even if Taylor can show deliberate indifference, he also must demonstrate that Sutterer or Siddiqui personally caused a violation of his constitutional rights. *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 242 (7th Cir. 2021) (citing *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). Put another way, Taylor must show that "the defendant's actions or inaction caused the delay in his treatment," *id.*, and that "the delay exacerbated the injury or

unnecessarily prolonged pain." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016)). Taylor has made no such showing and Wigton's independent actions as an outside specialist in many cases shield them in this sense.

## II.   *Deliberate Indifference Claim against Wexford Health Sources, Inc.*

Wexford argued that it approved Taylor's eye care regardless of cost. Taylor alleged that Wexford had an implied practice to keep costs low and that he was injured by Wexford's prioritization of cost-savings over effective treatment.

Because Wexford acts under color of state law by contracting to provide medical care to correctional facilities, it is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n. 6 (7th Cir. 2002). As a result, Wexford cannot be held liable for damages under a theory of *respondeat superior* for constitutional violations and can only be held liable under § 1983 for unconstitutional policies or widespread practices that cause a constitutional injury. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). To establish *Monell* liability, a plaintiff must prove the existence an *actual* policy or custom; that the policy or custom caused the constitutional injury, meaning the custom or policy was the "moving force" behind the injury; and that policymakers were deliberately indifferent to the known or obvious risk that the policy would lead to constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

In his response, Taylor ran through a series of facts that discussed the economics of Wexford's contract with IDOC in order for Wexford to make a profit on the contract. Taylor cited Sutterer's deposition testimony where he acknowledged instances where he made a recommendation for a referral that was in the best

interest of the patient and Wexford did not approve the referral. However, Taylor provided no evidence, beyond speculation, that any practice, either formal or informal, to withhold treatment and keep costs low existed, or caused him to receive constitutionally deficient medical care for his pain and vision problems. To reiterate, argument alone is insufficient to avoid summary judgment. Taylor must provide some evidence and, as Defendants point out, implications are not evidence. Furthermore, the evidence in the record indicates the opposite – that Wexford met Taylor's treatment needs and even approved specialist care in less than twenty-four hours when his IOPs became dangerously high.

CONCLUSION

Accordingly, the Court **GRANTS** the Motion for Summary Judgment (Doc. 109) and Plaintiff Paris Taylor's claims against Defendants Ryan Sutterer, Mohammed Siddiqui, and Wexford Health Sources, Inc. are **DISMISSED with prejudice**. As a result, Defendant Frank Lawrence, who was added to the docket in his official capacity only for addressing any injunctive relief, is **DISMISSED with prejudice** as well. The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   September 6, 2023**

*s/ Stephen P. McGlynn*
**STEPHEN P. McGLYNN**
**U.S. District Judge**
